UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                         :

UNITED STATES                                     :
                                                          :

               -v-                              :
                                                          :

SRINIVASA KAKKERA,                         :       22 Cr. 398 (GHW)
                                                            :

                                *Defendant.*    :
                                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

## THE GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT, SUPPRESS HISTORICAL CELL SITE, SEVER, AND COMPEL

 

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
*Attorney for the United States of America*

Adam S. Hobson
Assistant United States Attorney
    *- Of Counsel -*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 1

ARGUMENT ......................................................................................................................... 6

    I.     The Court Should Deny the Motion for a Bill of Particulars ............................. 6

        A.    Applicable Law ................................................................................................ 6

        B.    Discussion ........................................................................................................ 9

    II.    The Court Should Deny the Motion to Dismiss Count Fourteen ..................... 15

        A.    Applicable Law .............................................................................................. 15

        B.    Discussion ...................................................................................................... 17

    III.    The Court Should Deny the Motion to Sever ................................................. 19

        A.    Applicable Law .............................................................................................. 20

        B.    Discussion ...................................................................................................... 23

    IV.    The Court Should Deny the Motion to Suppress Historical Cell-Site Evidence .......... 25

        A.    Applicable Law .............................................................................................. 26

        B.    Discussion ...................................................................................................... 29

    V.    The Court Should Deny the Motion to Compel .............................................. 35

        A.    Applicable Law .............................................................................................. 35

        B.    Discussion ...................................................................................................... 40

    VI.    The Court Should Deny the Defendant's Discovery Motions ......................... 45

CONCLUSION .................................................................................................................... 49

## Table of Authorities

*Costello v. United States*,
   350 U.S. 359 (1956) ..................................................................... 16

*Davis v. United States*,
   564 U.S. 229 (2011) ..................................................................... 29

*Ferreira v. United States*,
   350 F. Supp. 2d 550 (S.D.N.Y. 2004) ........................................ 40

*Guzman v. Sabourin*,
   124 F. Supp. 2d 828 (S.D.N.Y. 2000) ........................................ 30

*Herring v. United States*,
   555 U.S. 135 (2009) ..................................................................... 29

*Illinois v. Gates*,
   462 U.S. 213 (1983) ..................................................................... 27

*Illinois v. Krull*,
   480 U.S. 340 (1987) ..................................................................... 28

*Kyles v. Whitley*,
   514 U.S. 419 (1995) ..................................................................... 37

*Massachusetts v. Sheppard*,
   468 U.S. 981 (1984) ..................................................................... 30

*Pina v. Henderson*,
   752 F.2d 47 (2d Cir. 1985) ..................................................... 39-40

*Rakas v. Illinois*,
   439 U.S. 128 (1978) ..................................................................... 30

*Richardson v. Marsh*,
   481 U.S. 200 (1987) ..................................................................... 21

*SEC v. Dresser Industries, Inc.*,
   628 F.2d 1368 (D.C. Cir. 1980) (en banc) ................................. 46

*SEC v. Shkreli, No. 15 Civ. 7175*
   (KAM), 2016 WL 1122029 (E.D.N.Y. Mar. 22, 2016) ............ 43-44

*SEC v. Stanard, No. 06 Civ. 7736*
   (GEL), 2007 WL 1834709 (S.D.N.Y. June 26, 2007) ......... 40, 41, 45

*Texas v. Brown*,
   460 U.S. 730 (1983) ..................................................................... 27

*United States v. Aguilar*,
   515 U.S. 593 (1995) ................................................................ 18, 19

*United States v. Alexandre, No. 22 Cr. 326*
  (JPC), 2023 WL 416405 (S.D.N.Y. Jan. 26, 2023) .......................................................... 43

*United States v. Alfonso,*
  143 F.3d 772 (2d Cir. 1998) ...................................................................................... 16

*United States v. Allums,*
  1997 U.S. Dist. LEXIS 14665 (S.D.N.Y. Sept. 25, 1997) ............................................. 49

*United States v. Avellino,*
  136 F.3d 249 (2d Cir. 1998) ...................................................................................... 37

*United States v. Barcelo,*
  628 F. App'x 36 (2d Cir. 2015) ...................................................................... 38, 39, 44

*United States v. Barcelo, No. 13 Cr. 38*
  (RJS), 2014 WL 4058066 (S.D.N.Y. Aug. 15, 2014) ................................................... 38

*United States v. Bellomo,*
  263 F. Supp. 2d 561 (E.D.N.Y. 2003) ................................................................... 15, 8

*United States v. Blakstad, No. 19 Cr. 486*
  (ER), 2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020) .................................................. 31, 35

*United States v. Blaszczak,*
  308 F.Supp.3d 736 (S.D.N.Y. 2018) .................................................... 41, 44, 46

*United States v. Blaszczak,*
  947 F.3d 19 (2d Cir. 2019) ..................................................................... 25-26

*United States v. Blount,*
  291 F.3d 201 (2d Cir. 2002) ...................................................................................... 22

*United States v. Boles,*
  914 F.3d 95 (2d Cir.) ................................................................................................ 28

*United States v. Bonventre, No. 10 Cr. 228*
  (LTS), 2014 WL 3673550 (S.D.N.Y. July 24, 2014) .................................................... 37

*United States v. Bortnovsky,*
  820 F.2d 572 (2d Cir. 1987) .................................................................................. 7, 9

*United States v. Cardascia,*
  951 F.2d 474 (2d Cir. 1991) ............................................................................... 21, 23

*United States v. Carson,*
  702 F.2d 351 (2d Cir. 1983) ...................................................................................... 23

*United States v. Casamento,*
  887 F.2d 1141 (2d Cir. 1989) .................................................................................... 24

*United States v. Chambers, No. 17 Cr. 396*
  (WHP), 2018 WL 1726239 (S.D.N.Y. Apr. 9, 2018) ...................................................... 7

*United States v. Cohen,*
   518 F.2d 727 (2d Cir. 1975) ........................................................................ 8

*United States v. Collins,*
   409 F. Supp. 3d 228 (S.D.N.Y. 2019) .................................. 41, 43, 44

*United States v. Contorinis,*
   No. 09 Cr. 1083 (RJS), slip op. ................................................................ 13

*United States v. Dawkins,*
   999 F.3d 767 (2d Cir. 2021) ...................................................................... 17

*United States v. DeVillio,*
   983 F.2d 1185 (2d Cir. 1993) .................................................................... 23

*United States v. Diaz,*
   176 F.3d 52 (2d Cir. 1999) ................................................................ 22, 24

*United States v. Dupree,*
   781 F. Supp. 2d 116 (E.D.N.Y. 2011) .................................................... 35

*United States v. Falso,*
   544 F.3d 110 (2d Cir. 2008) ...................................................................... 29

*United States v. Feyrer,*
   333 F.3d 110 (2d Cir. 2003) ...................................................................... 23

*United States v. Finnerty,*
   411 F. Supp. 2d 428 (S.D.N.Y. 2006) .................................................... 40

*United States v. Gallo, No. 98 Cr. 338*
   (JGK), 1999 WL 9848 (S.D.N.Y. Jan. 11, 1999) ................................ 47

*United States v. Gambino,*
   809 F. Supp. 1061 (S.D.N.Y. 1992) ........................................................ 17

*United States v. Gaskin,*
   364 F.3d 438 (2d Cir. 2004) ...................................................................... 27

*United States v. Guerrerio,*
   670 F. Supp. 1215 (S.D.N.Y. 1987) .................................................. 41, 7

*United States v. Hernandez,*
   85 F.3d 1023 (2d Cir. 1996) ...................................................................... 23

*United States v. Hernandez, No. 09 Cr. 625*
   (HB), 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010) .................................. 35

*United States v. Hunter,*
   32 F.4th 22 (2d Cir. 2022) .......................................................................... 37

*United States v. Hutcher,*
   622 F.2d 1083 (2d Cir. 1980) .................................................................... 39

*United States v. Jacobson,*
    4 F. Supp. 3d 515 (E.D.N.Y. 2014) ................................................................. 35

*United States v. Jimenez,*
    824 F. Supp. 351 (S.D.N.Y. 1993) ..................................................................... 8

*United States v. Juwa,*
    508 F.3d 694 (2d Cir. 2007) ........................................................................... 17

*United States v. Lanza,*
    790 F.2d 1015 (2d Cir. 1986) ......................................................................... 22

*United States v. Leon,*
    468 U.S. 897 (1984) ................................................................................. 28, 29

*United States v. Levy, No. 11 Cr. 62*
    (PAC), 2013 WL 664712 (S.D.N.Y. Feb. 25, 2013) ....................................... 35

*United States v. Locascio,*
    6 F.3d 924 (2d Cir. 1993) .......................................................................... 22, 39

*United States v. Matos-Peralta,*
    691 F. Supp. 780 (S.D.N.Y. 1988) ................................................................. 49

*United States v. Matthews,*
    20 F.3d 538, 16 (2d Cir. 1994) ...................................................................... 49

*United States v. Meregildo,*
    920 F. Supp. 2d 434 (S.D.N.Y. 2013) .................................................. 38, 40, 44

*United States v. Middendorf, No. 18 Cr. 36*
    (JPO), 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018) ................................. 41, 46

*United States v. Miller,*
    116 F.3d 641 (2d Cir. 1997) ........................................................................... 21

*United States v. Mitlof,*
    165 F. Supp. 2d 558 (S.D.N.Y. 2001) ............................................................ 12

*United States v. Montoya-Eschevarria,*
    892 F. Supp. 104 (S.D.N.Y.1995) ................................................................. 30

*United States v. Morgan,*
    302 F.R.D. 300 (S.D.N.Y. 2014) ................................................................... 40

*United States v. Muyet,*
    945 F. Supp. 586 (S.D.N.Y. 1996) ................................................................... 8

*United States v. Nacchio, No. 05 Cr. 545*
    (EWN), 2006 WL 2475282 (D. Colo. Aug. 25, 2006) ................................ 13, 14

*United States v. Nikas, No. 19 Cr. 716*
    (DLC), 2019 WL 6838673 (S.D.N.Y. Dec. 13, 2019) ..................................... 13

*United States v. Osorio*,
 949 F.2d 38 (2d Cir.1991) ............................................................ 30

*United States v. Pacheco*,
 902 F. Supp. 469 (S.D.N.Y. 1995) ............................................... 8

*United States v. Padilla*,
 508 U.S. 77 (1993) ....................................................................... 30

*United States v. Panza*,
 750 F.2d 1141 (2d Cir. 1984) ...................................................... 22

*United States v. Paulino*,
 850 F.2d 93 (2d Cir. 1988) .......................................................... 30

*United States v. Payden*,
 613 F. Supp. 800 (S.D.N.Y. 1985) ........................................ 10, 7-8

*United States v. Payne*,
 63 F.3d 1200 (2d Cir. 1995) ........................................................ 37

*United States v. Perez*,
 575 F.3d 164 (2d Cir. 2009) ........................................................ 17

*United States v. Perez*,
 940 F. Supp. 540 (S.D.N.Y. 1996) ............................................... 48

*United States v. Pinto-Thomaz*,
 352 F. Supp. 3d 287 (S.D.N.Y. 2018) .......................................... 12

*United States v. Pugh, No. 15 Cr. 116*
 (NGG), 2015 WL 9450598 (E.D.N.Y. Dec. 21, 2015) ................. 19

*United States v. Quattrone*,
 441 F.3d 153 (2d Cir. 2006) ............................................. 18, 18, 20

*United States v. Quinn*,
 445 F.2d 940 (2d Cir. 1971) ........................................................ 40

*United States v. Rajaratnam, No. 13 Cr. 211*
 (NRB), 2014 WL 1554078 (S.D.N.Y. 2014) ................................ 13

*United States v. Rhodes, No. 18 Cr. 887*
 (JMF), 2019 WL 3162221 (S.D.N.Y. July 16, 2019) ............... 45, 45

*United States v. Rigas*,
 583 F.3d 108 (2d Cir. 2009) ........................................................ 40

*United States v. Rittweger*,
 259 F. Supp. 2d 275 (S.D.N.Y. 2003) ........................................... 6

*United States v. Rittweger*,
 524 F.3d 171 (2d Cir. 2008) ........................................................ 23

*United States v. Rivera*,
    546 F.3d 245 (2d Cir. 2008) ................................................................................. 26

*United States v. Rosa*,
    11 F.3d 315 (2d Cir. 1993) ............................................................................. 23-24

*United States v. Ruggiero*,
    824 F. Supp. 379 (S.D.N.Y. 1993) ....................................................................... 30

*United States v. Salameh*,
    152 F.3d 88 (2d Cir. 1998) (per curiam) .......................................... 21, 23, 25, 28

*United States v. Salazar*,
    485 F.2d 1272 (2d Cir. 1973) ................................................................................. 7

*United States v. Sampson,*
    898 F.3d 287 (2d Cir. 2018) ................................................................................. 20

*United States v. Schwarz*,
    283 F.3d 76 (2d Cir. 2002) ............................................................................ 18, 18

*United States v. Serrano, No. 13 Cr. 58*
    (KBF), 2014 WL 2696569 (S.D.N.Y. June 10, 2014) ......................................... 30

*United States v. Singh*,
    390 F.3d 168 (2d Cir. 2004) ................................................................................. 33

*United States v. Skelos, No. 15 Cr. 317*
    (KMW), 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) ........................................ 7

*United States v. Smith*,
    9 F.3d 1007 (2d Cir. 1993) ................................................................................... 28

*United States v. Spinelli*,
    352 F.3d 48 (2d Cir. 2003) ............................................................................ 22, 23

*United States v. Stavroulakis*,
    952 F.3d 686 (2d Cir. 1992) ................................................................................. 16

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006) ..................................................................... 38, 39, 44

*United States v. Torres*,
    901 F.2d 205 (2d Cir. 1990) ................................................................................... 7

*United States v. Triumph Capital Grp., Inc.*,
    260 F. Supp. 2d 470 (D. Conn. 2003) .............................................................. 18, 18

*United States v. Turoff*,
    853 F.2d 1037 (2d Cir. 1988) ............................................................................... 21

*United States v. Upton*,
    856 F. Supp. 727 (E.D.N.Y. 1994) ....................................................................... 41

*United States v. Valenti*,
 60 F.3d 941 (2d Cir. 1995) ................................................................................. 49

*United States v. Vaughan, No. 10 Cr. 233*
 (CM), 2010 WL 3025648 (S.D.N.Y. July 27, 2010) ........................................... 9

*United States v. Velastegui*,
 199 F.3d 590 (2d Cir. 1999) ............................................................................... 16

*United States v. Velissaris, No. 22 Cr. 105*
 (DLC), 2022 WL 2392360 (S.D.N.Y. July 3, 2022) ......................................... 38

*United States v. Ventresca*,
 380 U.S. 102 (1965) ........................................................................................... 28

*United States v. Walsh*,
 194 F.3d 37 (2d Cir. 1999) ...................................................................... 15, 7, 9, 10

*United States v. Walters*,
 910 F.3d 11 (2d Cir. 2018) ................................................................................. 17

*United States v. Yannotti*,
 541 F.3d 112 (2d Cir. 2008) ............................................................................... 16

*United States v. Yousef*,
 327 F.3d 56 (2d Cir. 2003) ................................................................................. 24

*United States v. Yu, No. 97 Cr. 102*
 (SJ), 1998 WL 57079 (E.D.N.Y. Feb. 5, 1998) ............................................ 47-48

*United States v. Zafiro*,
 945 F.2d 881 (7th Cir. 1991) ........................................................................... 21-22

*Walczyk v. Rio*,
 496 F.3d 139 (2d Cir. 2007) ......................................................................... 34, 34

*Wong Tai v. United States*,
 273 U.S. 77 (1927) ............................................................................................... 7

*Zafiro v. United States*,
 506 U.S. 534 (1993) ........................................................................... 21, 22, 22, 26

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to defendant Srinivasa Kakkera's motions for (1) a bill of particulars, (2) dismissal of the conspiracy to obstruct justice count, (3) severance, (4) suppression of historical cell-site evidence, (5) an order directing the Government to search the files of the Securities and Exchange Commission ("SEC"), and (6) an order directing certain disclosures.   Kakkera's motions should be denied.

Kakkera conspired with his friend Amit Bhardwaj to steal confidential information from Bhardwaj's employer, Lumentum, about Lumentum's anticipated acquisition of Neophotonics. Kakkera then purchased massive amounts of stock and options in Neophotonics's stock in the weeks leading up to the merger announcement.   He also tipped several friends and a family member, who also purchased options in the target company's stock.   When the Federal Bureau of Investigation ("FBI") approached the conspirators and served them grand jury subpoenas, the conspirators concocted cover stories and agreed to lie about the scheme, create false documents, and obstruct the federal investigation.

The defendant has filed a grab-bag of pretrial motions, most of which are couched as attacks on the pleadings or the Government's discovery efforts but are in fact premature attempts to make evidentiary arguments about the strength of the Government's anticipated case at trial. The motions should be denied in their entirety.

## FACTUAL BACKGROUND

On July 21, 2022, a grand jury sitting in this District returned Indictment 22 Cr. 398 (GHW) (the "Indictment"), charging Amit Bhardwaj, Srinivasa Kakkera, and Abbas Saeedi in fourteen counts.   The Indictment charges Kakkera specifically with one count of conspiracy to commit securities fraud and wire fraud ("Count Seven"), one count of securities fraud ("Count Ten"), one

count of wire fraud ("Count Thirteen"), and one count of conspiracy to obstruct justice ("Count Fourteen").

In 2020, Amit Bhardwaj was the Chief Information Security Officer of Lumentum Holdings Inc. ("Lumentum"), a company specializing in the manufacture of optical and photonic products.   Indictment ¶¶ 1, 6.   In his role as Chief Information Security Officer, Bhardwaj learned confidential information about nonpublic merger negotiations between Lumentum and two separate acquisition targets—Coherent Inc. ("Coherent") and Neophotonics Corporation ("Neophotonics").   *Id.* ¶¶ 2-3.   Bhardwaj used that nonpublic information to personally trade in the targets' securities, and to tip friends and family members, who also traded in the targets' securities.   *Id.* ¶¶ 2-3.

First, in the fall of 2020 and the winter of 2021, Bhardwaj learned that Lumentum was negotiating a merger with Coherent.   *Id.* ¶ 2.   In violation of the duties of trust and confidence that he owed to Lumentum, Bhardwaj traded in Coherent securities and also tipped other friends and family members, including co-defendant Abbas Saeedi and a friend named Dhirenkumar Patel. *Id.*   In total, Bhardwaj and his co-conspirators made nearly $900,000 in realized and unrealized profits when Coherent's stock price rose after the merger was publicly announced in January 2021. *Id.*

Bhardwaj and Patel had arranged for Patel to pay Bhardwaj, in exchange for Bhardwaj's insider information about the Coherent merger, fifty percent of the profits that Patel earned by trading in Coherent securities based on Bhardwaj's information.   *Id.* ¶ 18.   In addition, Bhardwaj loaned Patel $40,000 to partially fund Patel's trades in Coherent securities advance of the merger announcement.   *Id.*   After the merger announcement, the repayment of the $40,000 and Bhardwaj's share of Patel's profits totaled approximately $100,000.   *Id.*   In order to conceal the

nature of that payment, Bhardwaj directed Patel to pay the $100,000 to Kakkera.  *Id.*  Patel falsely described that $100,000 payment to Kakkera in the check's memo line as a loan from Patel to Kakkera, when in fact it was a payment by Patel for the material nonpublic information Bhardwaj had provided.  *Id.*  In addition, Bhardwaj drafted a promissory note that falsely represented the $100,000 payment as a loan, and Kakkera signed that note.  *Id.*

From approximately August 2020 through January 2021—i.e., the time Lumentum was considering an acquisition of Coherent—Lumentum was also considering an acquisition of Neophotonics.  *Id.* ¶ 13.  In approximately December 2020, after learning that Lumentum was considering an acquisition of Neophotonics, Bhardwaj himself purchased Neophotonics stock and call options based on his advance knowledge of Lumentum's interest in acquiring Neophotonics.  *Id.* ¶ 14.  Bhardwaj also provided this material nonpublic information about a Lumentum-Neophotonics transaction to Saeedi, who caused a brokerage account held in the name of a close family member to purchase options contracts in Neophotonics.  *Id.* ¶ 15.  Ultimately, Lumentum decided not to go forward with an acquisition of Neophotonics at that time and instead moved forward with the Coherent acquisition.  *Id.* ¶ 16.

In or about October 2021, Lumentum re-engaged in confidential discussions with Neophotonics about a potential acquisition.  *Id.* ¶ 20.  Those discussions continued over the ensuing weeks, and on November 4, 2021, before the market opened, Lumentum and Neophotonics publicly announced that Lumentum would be acquiring Neophotonics.  *Id.*  Prior to that announcement, the fact that Lumentum was going to acquire Neophotonics was not publicly confirmed by either company.  *Id.*  The day the merger was announced, Neophotonics's stock price increased approximately 38.8% over the previous day's closing price.  *Id.*

At least as of October 2021, Bhardwaj learned that Lumentum had resumed its negotiations

to acquire Neophotonics.  *Id.* ¶ 21.   In violation of the duties of trust and confidence that he owed to Lumentum, and in violation of Lumentum's insider trading policy, Bhardwaj provided this material nonpublic information to others, including Kakkera and Saeedi, as well as Ramesh Chitor, another friend of Bhardwaj, with the expectation that they would use it to trade securities.  *Id.* Kakkera, Saeedi, and Chitor each used this material nonpublic information to make purchases of Neophotonics securities in advance of the November 4 merger announcement.  *Id.* ¶ 22.   Kakkera purchased at least 129,350 Neophotonics shares and 3,024 Neophotonics call option contracts based on the material nonpublic information Bhardwaj had provided.  *Id.* ¶¶ 47(b), 61.   When Neophotonics's stock price jumped following the merger announcement, Kakkera, Saeedi, and Chitor closed their positions and made approximately $4.3 million in realized and unrealized profits.  *Id.* ¶ 23.

In addition to trading himself, Kakkera used the material nonpublic information he had obtained from Bhardwaj to advise others, including a close family member, to purchase Neophotonics securities in advance of the November 4 announcement.  *Id.* ¶ 24.   Those other individuals made at least approximately $200,000 by executing timely trades in Neophotonics securities in advance of the merger announcement.  *Id.*

At the time Bhardwaj provided the nonpublic information about the Neophotonics merger to Chitor, Bhardwaj and Chitor agreed to a similar deal that Bhardwaj and Patel had reached with respect to insider trading in Coherent securities.  *Id.* ¶ 25.   Bhardwaj and Chitor agreed that Chitor would pay Bhardwaj fifty percent of the profits that Chitor earned by trading in Neophotonics securities based on Bhardwaj's material nonpublic information.  *Id.*   As with Patel, Bhardwaj also directed Chitor to make the payment in a complicated manner that would avoid detection—Bhardwaj and Chitor agreed that Chitor would pay Bhardwaj his portion of the profits

by having associates of Chitor pay a relative of Bhardwaj in India.  *Id.*   Based on this agreement, from at least in or about November 2021 through December 2021, Chitor's associates paid Bhardwaj's relative tens of thousands of dollars worth of Indian rupees.  *Id.*

On March 29, 2022, Special Agents with the FBI conducted voluntary interviews of multiple individuals involved in the insider trading scheme, including Kakkera and Saeedi.  *Id.* ¶ 26.   During his interview, Kakkera falsely told FBI agents that he never spoke with Bhardwaj about a deal between Lumentum and Neophotonics and that his decision to invest in Neophotonics was based solely on his own research.  *Id.*   Kakkera also falsely told FBI agents that the $100,000 he received from Patel was a loan, when, in fact, it was payment from Patel for Bhardwaj's having provided Patel with material nonpublic information to make well-timed trades in Coherent stock.  *Id.*   Also on March 29, 2022, the FBI served Kakkera, Saeedi, and Bhardwaj with grand jury subpoenas issued by a grand jury sitting in the Southern District of New York, seeking various documents, including documents relating to securities trading in Neophotonics.  *Id.* ¶ 27.

Following their March 29, 2022 interviews with the FBI and receipt of grand jury subpoenas, Kakkera, Saeedi, and Bhardwaj took numerous steps to obstruct the federal investigation into their insider trading.  *Id.* ¶ 28.   The three men, along with Patel, met in person on multiple occasions.  *Id.* ¶ 30.   During those meetings, they discussed potential false stories that would conceal their insider trading scheme, as well as creating false documents to buttress lies regarding payments that were related to the insider trading scheme.  *Id.*   Also during this period, Kakkera and Patel created a new fake promissory note purporting to show that the $100,000 paid by Patel to Kakkera in September 2021 was a loan, and not the proceeds of illegal insider trading. *Id.* ¶ 31.

**ARGUMENT**

**I.      The Court Should Deny the Motion for a Bill of Particulars**

Kakkera seeks to compel the Government to specify a laundry list of information about the charges, including (1) the identities of all known co-conspirators; (2) the substance and dates of the alleged MNPI provided to Kakkera; (3) the alleged personal benefit obtained by Bhardwaj in exchange for the information he provided to Kakkera; (4) the particular securities transactions Kakkera made on the basis of MNPI; and (5) various additional details about the obstruction conspiracy.   As to certain of these topics – particularly the identities of co-conspirators and the specific trades that constitute acts that are part of the charged offense – the Government has *already* voluntarily provided the defendant with the particulars he seeks.   But, as to the others, the 36-page Indictment, Rule 16 discovery, and supplemental information that the Government has already provided about these topics more than satisfies the limited requirements of Federal Rule of Criminal Procedure 7(f).   This motion should be denied as "an impermissible attempt to compel the Government to provide the evidentiary details of its case." *United States v. Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003).

**A.  Applicable Law**

The Federal Rules of Criminal Procedure provide that a court "may direct the government to file a bill of particulars," Fed. R. Crim. P. 7(f), but case law is clear that the sole legitimate purpose of a bill of particulars is to furnish facts that are necessary to apprise a defendant of the charges against him with sufficient precision to (i) enable him to prepare his defense, (ii) avoid unfair surprise at trial, and (iii) preclude a second prosecution for the same offense.   *See Wong Tai v. United States*, 273 U.S. 77, 80-82 (1927); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam); *United*

*States v. Salazar*, 485 F.2d 1272, 1278 (2d Cir. 1973).   In other words, "[a] bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999).

A bill of particulars cannot be used as a general investigative tool or as a means to gather additional detail about the Government's case.   *See Torres*, 901 F.2d at 234 ("Acquisition of evidentiary detail is not the function of the bill of particulars."); *United States v. Chambers*, No. 17 Cr. 396 (WHP), 2018 WL 1726239, at \*2 (S.D.N.Y. Apr. 9, 2018).   For example, "a defendant is not entitled to disclosure of the manner in which the government will attempt to prove the charge, the precise manner in which the government will allege the defendant committed the crimes charged, or a preview of the government's evidence or legal theories."   *United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, at \*13 (S.D.N.Y. Oct. 20, 2015).   A bill of particulars "is not a discovery tool and is not intended to allow defendants a preview of the evidence or the theory of the government's case."   *United States v. Guerrerio*, 670 F. Supp. 1215, 1225 (S.D.N.Y. 1987).   "It is not enough that the information would be useful to the defendant; if the defendant has been given adequate notice of the charges against him, the government is not required to disclose additional details about its case."   *United States v. Payden*, 613 F. Supp. 800, 816 (S.D.N.Y. 1985).   Indeed, bills of particulars are generally disfavored because they "confine[] the government's evidence at trial to the particulars furnished." *Payden*, 613 F. Supp. at 816; *see also United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to . . . restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory.").

Where, as here, the defendant is charged with criminal conspiracy, the Government is not required to provide a bill of particulars setting forth details regarding the conspiracy.   As the Second Circuit has stated, "[t]he Government need not, when charging conspiracy, set out with precision each and every act committed by the conspirators in the furtherance of the conspiracy." *United States v. Cohen*, 518 F.2d 727, 733 (2d Cir. 1975).   A defendant in a conspiracy case is "not entitled to a bill of particulars setting forth the 'whens,' 'wheres,' and 'with whoms' regarding the . . . enterprise and conspiracy."   *United States v. Muyet*, 945 F. Supp. 586, 599 (S.D.N.Y. 1996).   Nor is a defendant entitled to a bill of particulars setting forth "how or when the conspiracy was formed or how or when defendants joined the conspiracy."   *United States v. Pacheco*, 902 F. Supp. 469, 474 (S.D.N.Y. 1995).   Nor is a bill of particulars appropriate where a defendant seeks information regarding all of the overt acts in furtherance of the conspiracy or an accounting of the particular acts that a specific defendant participated in, had knowledge of, or for which he is being held responsible.   *See United States v. Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) (denying a motion for a bill of particulars in which defendants sought "further specifics of the particular acts they are alleged to have participated in or for which they are being held responsible").   Indeed, "[p]retrial motions for such information are routinely denied," *Jimenez*, 824 F. Supp. at 363.

A bill of particulars, moreover, is unnecessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means, such as through discovery or in discussions with counsel.   *See Walsh*, 194 F.3d at 47 (finding defendant adequately informed of nature of charges through discovery); *Bortnovsky*, 820 F.2d at 574   (court should consider the text of the Indictment, as well as discovery and other information supplied to the defendant); *United States v. Vaughan*, No. 10 Cr. 233 (CM), 2010 WL 3025648, at *2 (S.D.N.Y. July 27, 2010) ("If the information the defendant seeks is provided in the indictment or in some acceptable

alternate form, such as discovery, no bill of particulars is required." (internal quotation and citation omitted)).   For this reason, the Court must consider all of the information available to the defendant, through whatever means, before imposing the obligation to issue a bill of particulars.

### B.  Discussion

The 36-page Indictment, supplemented by the Rule 16 discovery and additional (and extensive) voluntary disclosures made by the Government, provides Kakkera with more than enough notice of the charges against him, all of which arise from a relatively short-term and straightforward insider trading conspiracy.   In fact, the Indictment begins with a 13-page, 31-paragraph speaking section which describes, in detail, how Bhardwaj stole from his employer MNPI about nonpublic merger negotiations with two targets, Coherent and Neophotonics, Indictment ¶¶ 1-17, 20-25; how Bhardwaj then provided this information to his friends, including Kakkera; how those friends, including Kakkera, then used that MNPI by trading in the targets' securities, *id.*; how Kakkera also used that MNPI to advise others, including a close family member, to purchase securities, *id.* ¶ 24; and how Bhardwaj, Kakkera, and others then tried to obstruct the federal investigation into their insider trading scheme (*id.* ¶¶ 18-19, 26-31).   The Indictment even alleges the approximate dates, types, and volume of the trades that Kakkera and some of his co-conspirators made using MNPI.   *See id.* ¶ 61.

The Indictment itself provides more than enough information to "advise the defendant of the specific acts of which he is accused."   *Walsh*, 194 F.3d at 47.   But Kakkera also has notice of the crimes of which he has been accused because of the voluminous Rule 16 discovery that has been produced, and which includes the trading records of Kakkera and his co-conspirators. Moreover, on April 25, 2023, despite the fact that the Indictment and Rule 16 discovery already provided Kakkera with all the information to which he is at this point entitled, the Government

provided Kakkera with a detailed letter setting forth even more information about the charged insider trading scheme.   *See* Ex. A (April 15, 2023 letter).   That letter identified, among other things, the names of twelve participants in the insider trading scheme other than the named defendants and the names of the participants in the obstruction conspiracy.   *See* Ex. A at 1-2. The letter also clarified the nature of the MNPI that Bhardwaj disclosed to Kakkera and the transactions Kakkera made that were based on inside information.   Given the extensive information the Government has already provided about the charged conduct, Kakkera cannot reasonably claim that he does not know what he has been accused of.

Each of Kakkera's specific demands for particulars is either a demand for information that has already been disclosed, or a demand for a level of specificity that is designed not to advise him of the charges but to get a glimpse of the Government's trial strategy and to "confine[] the government's evidence at trial to the particulars furnished."   *Payden*, 613 F. Supp. at 816.

For example, Kakkera demands that the Government provide the "identities of all known co-conspirators in the Count Seven insider trading conspiracy.   Def. Mot. for Bill of Particulars at 11.   But in its April 15 letter, the Government already provided Kakkera with a list of participants in this offense, stating that "the participants in the offense charged in Count Seven included, among others, Srinivasa Kakkera, Amit Bhardwaj, Abbas Saeedi, Sravanthi Cheeti, Ramesh Chitor, Nageshwer Ganib, Madhu Gourineni, Srinivas Gourineni, Nagaraju Jaavaji, Nataraj Jaavaji, Saritha Kakkera, Umapathi Kakkera, Dhirenkumar Patel, Chandra Surabhi, and Raghuveer Surabhi."   Ex. A at 2.   Thus, contrary to his claim, the defendant does not have to "guess" which individuals are participants in the conspiracy.   Def. Mot. at 13.   The Government has already told him.

Similarly, the Government has already disclosed to Kakkera "the trades it intends to rely

upon as proof of the conspiracy charged in Count Seven." Def. Mot. for Bill of Particulars at 17. The Indictment alleges that in October and November 2021, Kakkera purchased 129,350 Neophotonics shares and 3,024 Neophotonics call options based on the MNPI provided by Bhardwaj. Indictment ¶ 47(b). The Government has also produced in discovery the trading records of other participants in the insider trading, including not only co-defendants Bhardwaj and Saeedi, but also the friends and family members whom Kakkera tipped.[1]

As for Kakkera's request for "the substance of the alleged MNPI provided to Mr. Kakkera and the approximate dates such MNPI was provided," Def. Mot. at 13, as this Court has previously recognized, a defendant cannot use a bill of particulars to obtain "the precise substance of the MNPI" illegally conveyed where, as here, the Government has provided the defendant with "notice of the nature of the MNPI at issue" with sufficient specificity to allow him to prepare for trial. *United States v. Chow*, No. 17 Cr. 667 (GHW) 2/9/2018 Tr. (Dkt. 69) at 72, 75. In particular, the Indictment in this case alleges that in October 2021, Bhardwaj tipped Kakkera and others with nonpublic information that Lumentum was negotiating to acquire Neophotonics. Indictment ¶¶ 3, 21-24, 47. The discovery also includes phone records and cellsite data showing that Bahardwaj and Kakkera were in frequent contact at the time of the alleged trading, trading records showing that Bhardwaj and Kakkera traded in parallel, and facts about the Neophotonics acquisition showing significant dates in the course of the merger discussions that roughly correspond to the

---

[1] Defendant Saeedi is charged in a separate conspiracy with Bhardwaj to trade in Neophotonics, but Saeedi's trades will be relevant trial evidence against Kakkera, including to corroborate the timing of Bhardwaj's tipping of material nonpublic information and as background to the obstruction conspiracy involving Saeedi, Kakkera, and Bhardwaj. As for the friends and family members whom Kakkera tipped and caused to trade, and whose trading is relevant both to the conspiracy count and Kakkera's substantive insider trading count, the Government has already provided their names to defense counsel and has produced their corresponding trading records in discovery.

dates on which Bahardwaj and Kakkera placed their trades.   Where an indictment "clearly describes the overall nature of the [material nonpublic] information," no bill of particulars "is necessary to particularize exactly what material nonpublic information" was conveyed.   *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 302 (S.D.N.Y. 2018).   In light of how much information has already been provided about the substance and timing of the MNPI, Kakkera seems to be seeking the precise date, time, and words that Bhardwaj used to communicate the tip. But the "wheres, whens and with whoms" are precisely the types of questions that courts have deemed "beyond the scope of a bill of particulars."   *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001).[2]

Kakkera's demand for specific information about the personal benefit Bhardwaj expected to receive in exchange for providing MNPI to Kakkera also seeks more than he is entitled to and appears to be an inappropriate attempt to prematurely limit the manner in which the Government will prove its case at trial.   There is no requirement that an Indictment even allege what personal benefit the tipper received, *see United States v. Rajaratnam*, No. 13 Cr. 211 (NRB), 2014 WL 1554078, *2 (S.D.N.Y. 2014), and a tipper can receive multiple personal benefits in exchange for providing MNPI.   Here, for example, the Indictment notes that Bhardwaj expected his tippees to pay him a portion of their profits, *see* Indictment ¶¶ 18-19, 25, and also that Bhardwaj had close personal relationships with his tippees, *see id.* ¶ 10.   In the face of these allegations, Kakkera

---

[2] Kakkera's request for this information appears to be in pursuit of his purported defense that he had begun purchasing Neophotonics securities on October 15, 2021, even though, according to Kakkera, Bhardwaj did not learn about the merger negotiations until October 25, 2021.   But the Government expects to show at trial that Bhardwaj did in fact know about the merger negotiations prior to October 15, 2021, and that all of Kakkera's trading in Neophotonics securities in October and November 2021 was based on Bhardwaj's MNPI that Lumentum was negotiating to acquire Neophotonics.

cannot demonstrate that "he is unaware of the nature of the charge against him or that there is a likelihood of unfair surprise at trial with respect to the personal benefit element." *Chow*, No. 17 Cr. 667 (GHW) 2/9/2018 Tr. (Dkt. 69) at 79.[3]

This case is also unlike those few cases identified by Kakkera where the district court ordered the Government to disclose certain particulars.   Among other things, those cases involved indictments with significantly more charges and more trading activity to parse than that at issue here.[4]   By contrast with those cases, the Indictment here contains only four counts against Kakkera involving a single issuer, and specifies the trades at issue, the provider of the MNPI, and the subject of the MNPI.   As Judge Swain explained in rejecting an argument like Kakkera's: "specificity as to the substance of tipping communications may sometimes be necessary in complex insider trading cases involving multiple alleged conspirators and communications, large numbers of companies and transactions and extended time periods . . . [but] no such challenge of complexity is presented here."   *United States v. Stewart*, No. 15 Cr. 287 (LTS) (S.D.N.Y. 2016) (Dkt. 64 at 22).   So too here.   Because the details provided by the Government go beyond what the law requires, Kakkera's motion for a bill of particulars with respect to the insider trading counts should be denied.

---

[3] The only case Kakkera cites in support of this request is *United States v. Nikas*, No. 19 Cr. 716 (DLC), 2019 WL 6838673, at *2 (S.D.N.Y. Dec. 13, 2019).   In fact, in *Nikas*, Judge Cote expressly stated that her order did not require the identification of all personal benefits the tipper received in exchange for the MNPI, but directed only the identifications of the payments already expressly referred to in the Indictment.   *See id.* at *2 and n.4.   Her order thus did not limit the Government's manner of proof at trial in any way.

[4] For example, in *United States v. Contorinis*, No. 09 Cr. 1083 (RJS), slip op. at 1-2 (S.D.N.Y. May 5, 2010), the charges spanned a period of over two years where hundreds of trades in multiple stocks took place, and in *United States v. Nacchio*, No. 05 Cr. 545 (EWN), 2006 WL 2475282, at *6 (D. Colo. Aug. 25, 2006), the Indictment had forty-two counts and allegations of using material nonpublic information were not tied to any particular count.

Finally, with respect to the obstruction of justice conspiracy charged in Count Fourteen, as with the insider trading counts, the Indictment already provides everything Kakkera is entitled to and more.   It alleges the approximate time of the conspiracy (from March 2022 through April 2022), the members of the conspiracy, and the goal of the conspiracy.   *See* Indictment ¶ 65.   The Indictment also alleges that the members of the conspiracy, including Kakkera, learned about the grand jury investigation on or about March 29, 2022, when the FBI served each of them with grand jury subpoenas seeking various documents, including documents related to securities trading in Neophotonics.   *Id.* ¶ 27.   The Indictment alleges that after receiving these grand jury subpoenas, the co-conspirators met in person on multiple occasions and discussed, among other things, potential false stories that would conceal their insider trading scheme, as well as creating false documents to buttress their lies.   *Id.* ¶ 30.   Kakkera and Patel even created a fake document purporting to show that the $100,000 paid by Patel to Kakkera was a loan, and not the proceeds of illegal insider trading.   *Id.* ¶ 31.   And Bhardwaj worked to ensure that potentially incriminating information from his work laptop would be deleted and unavailable to law enforcement.   *Id.* ¶ 30. Nothing more is required to "advise the defendant of the specific acts of which he is accused." *Walsh*, 194 F.3d at 47.

Despite these detailed allegations in the Indictment, Kakkera has sought more particulars about when exactly Kakkera is supposed to have learned that the $100,000 payment Patel made to Kakkera at Bhardwaj's direction was part of the insider trading scheme.   Kakkera admits that his interest in this information is purely one of trial strategy, as he considers whether to move to exclude evidence of the false promissory note as something that should "be precluded under Fed. R. Evid. 403," or should instead be "inadmissible under Fed. R. Evid. 404(b)."   Def. Mot. for Bill of Particulars at 19.   But a "bill of particulars is not designed to: obtain the government's

evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory." *Bellomo*, 263 F. Supp. 2d at 580.   The Indictment alone sufficiently informs the defendant of the obstruction charge against him, and the defendant has already had the benefit of the Government voluntarily providing supplemental information to assist in the defendant in his preparation for trial.   Much less would have been sufficient and certainly nothing more is required.

## II.   The Court Should Deny the Motion to Dismiss Count Fourteen

Kakkera moves to dismiss Count Fourteen, which charges him with conspiring to obstruct justice.   Kakkera contends that, at trial, the Government will be able to prove at most that Kakkera was attempting to obstruct a federal investigation in general, rather than a grand jury investigation in particular.   The Government strongly disagrees—but that is beside the point, because at this stage of the proceedings, it is the allegations in the Indictment that control, and those allegations state a claim for conspiracy to obstruct justice.

### A.  Applicable Law

It is "well settled that 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling* v. *United States*, 418 U.S. 87, 117 (1974)).   In other words, as the Second Circuit has explained, the indictment must charge the defendant with "sufficient precision to inform the defendant of the charges he must meet" and "with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Stavroulakis*, 952 F.3d 686, 693

(2d Cir. 1992).   To satisfy these twin goals, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (quoting *Alfonso*, 143 F.3d at 776).   Federal Rule of Criminal Procedure 7(c) "encourage[s] succinct pleadings," and "common sense must control." *Stavroulakis*, 952 F.2d at 693.

When considering a motion to dismiss an indictment, "the facts alleged by the government must be taken as true." *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999).   The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charges on the merits." *Costello v. United States*, 350 U.S. 359, 365 (1956).   It is not proper to weigh the sufficiency of the evidence underlying the indictment, unless the Government has already made "a full proffer of the evidence it intends to present at trial." *United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009).   This rule exists because indictments are "not meant to serve an evidentiary function," but rather, "to acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007). Accordingly, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). "That is something [courts] do after trial." *Id.*; *see also United States v. Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992) ("It is axiomatic that, in a criminal case, a defendant may not challenge a facially valid indictment prior to trial for insufficient evidence.   Instead, a defendant must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary sufficiency."), *aff'd* 17 F.3d 572 (2d Cir. 1994).   Dismissal of an indictment is a "drastic remedy that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910

F.3d 11, 26 (2d Cir. 2018).

### B.  Discussion

The Indictment alleges a conspiracy to violate 18 U.S.C. § 1503, which, in relevant part, provides that "[w]hoever corruptly . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished."   To prove obstruction of justice, the Government must prove "(1) that there is a pending judicial or grand jury proceeding constituting the administration of justice, (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not the defendant is successful in doing so—that is, that the defendant corruptly intended to impede the administration of that judicial proceeding."   *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006); *see also United States v. Triumph Capital Grp., Inc.*, 260 F. Supp. 2d 470, 475 (D. Conn. 2003) (denying motion to dismiss obstruction claim where indictment alleged that defendant "(1) endeavored (2) corruptly (3) to influence or obstruct the due administration of justice").   The Indictment tracks the statutory language and alleges each of these elements, charging that Kakkera and his co-conspirators "would and did corruptly endeavor to influence, obstruct, and impeded the due administration of justice," Indictment ¶ 66, and is thus sufficient to withstand a motion to dismiss.

The defendant contends that the Supreme Court's decision in *United States v. Aguilar*, 515 U.S. 593 (1995), and the Second Circuit's decision in *United States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002), compel a different result.   But neither *Aguilar* nor *Schwarz* involved the sufficiency of an indictment; they instead both involved the sufficiency of the proof at trial, following a Rule 29 motion.   The Court in *Aguilar* held that to sustain a conviction under § 1503, the obstructive conduct must have "some relationship in 'time, causation, or logic' to a judicial or grand jury

proceeding so that it may be said to have the 'natural and probable effect' of interfering with that judicial proceeding.'"  *Schwarz*, 283 F.3d at 108 (citing *Aguilar*, 515 U.S. at 599-600, 601).   This "nexus limitation is best understood as an articulation of the proof of wrongful intent that will satisfy the *mens rea* requirement of 'corruptly' obstructing or endeavoring to obstruct." *Quattrone*, 441 F.3d at 170.   But, as the District of Connecticut observed in denying a similar motion to dismiss based on *Aguilar* and *Schwarz*, "neither case held that the nexus requirement, i.e., a relationship in time, causation or logic between the conduct and the judicial proceeding, is an element of § 1503 that must be alleged in the indictment."  *Triumph Capital Grp.*, 260 F. Supp. 2d at 475.   In *Triumph Capital*, as here, the defendant "conflate[d] pleading with proof," because "the nexus requirement must only be proved at trial," where "the government must offer evidence of conduct 'that, in [the defendant's] mind, has the 'natural and probable effect' of obstructing or interfering with [the grand jury].'"  *Id.* (quoting *Schwarz*, 283 F.3d at 109); *see also United States v. Pugh*, No. 15 Cr. 116 (NGG), 2015 WL 9450598, at *16 (E.D.N.Y. Dec. 21, 2015) (denying motion to dismiss obstruction count because "on a pre-trial motion to dismiss an indictment, the court must assume the prosecution's allegations will be proven at trial and draw all reasonable inferences from those allegations").

Kakkera suggests that the Government will not be able to prove that Kakkera intended to obstruct a grand jury proceeding, but only at most that he intended to obstruct a "federal investigation."   Def. Mot. to Dismiss at 1.   But that is a question of the sufficiency of the proof, and it will not be ripe until the full evidence is before the Court.   Even at this stage of the proceedings, though, the factual allegations contained in the Indictment show a much stronger nexus to the grand jury proceedings than were present in *Aguilar* and *Schwarz*, where "all that was proved" was "uttering false statements to an investigating agent . . . who might or might not testify

before a grand jury." *Aguilar*, 515 U.S. at 600.   Here, in contrast, the Indictment alleges that the members of the conspiracy, including Kakkera, learned about the grand jury investigation on or about March 29, 2022, when the FBI served each of them with grand jury subpoenas seeking various documents, including documents related to securities trading in Neophotonics, Indictment ¶ 27; that after receiving these grand jury subpoenas, the co-conspirators met in person on multiple occasions and discussed, among other things, potential false stories that would conceal their insider trading scheme, as well as creating false documents to buttress their lies, *id.* ¶ 30; that after receiving the grand jury subpoena for documents, Kakkera and Patel even created a fake document purporting to show that the $100,000 paid by Patel to Kakkera was a loan, and not the proceeds of illegal insider trading, *id.* ¶ 31; and that Bhardwaj worked to ensure that potentially incriminating information from his work laptop would be deleted and unavailable to law enforcement, *id.* ¶ 30. Unlike in *Aguilar* and *Schwarz*, even the allegations within the Indictment show that "the defendant has notice that his wrongful conduct will affect the administration of justice, because false information will be provided to a grand jury or otherwise pertinent information known to be called for by a grand jury may be placed beyond its reach." *Quattrone*, 441 F.3d at 171.[5]

### III.   The Court Should Deny the Motion to Sever

Kakkera has moved to sever his trial from the trial of his only remaining co-defendant,

---

[5] With respect to the fake promissory note that Kakkera and Patel created after receiving the grand jury subpoena, Kakkera contends that this fake note cannot support an obstruction charge because there is no allegation that Kakkera in fact provided the fake note to the grand jury.  Def. Mot. to Dismiss at 14-15.  But this argument ignores the fact that § 1503 prohibits the inchoate crime of "endeavor[ing]" to impede the due administration of justice, which encompasses obstructive behavior that falls short even of an "attempt."  *United States v. Sampson*, 898 F.3d 287, 301-02 (2d Cir. 2018).  Moreover, the alleged crime here is a *conspiracy* to obstruct justice; the conspirators need not have succeeded.

Abbas Saeedi.   Kakkera and Saeedi are both charged in the same conspiracy to obstruct justice, and Kakkera and Saeedi both traded in Neophotonics based on MNPI provided by Bhardwaj. There is no basis to sever, and the motion should be denied.

### A.  Applicable Law

Rule 8 of the Federal Rules of Criminal Procedure provides, in pertinent part:

> (a) Joinder of Offenses.   The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

> (b) Joinder of Defendants.   The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.   The defendants may be charged in one or more counts together or separately.   All defendants need not be charged in each count.

Rule 14 of the Federal Rules of Criminal Procedure permits severance of properly joined charges or defendants, at the discretion of the trial court, to avoid prejudice to a defendant or the Government.

Balancing Rule 8 against Rule 14, "[t]here is a preference . . . for joint trials of defendants who are indicted together."   *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (per curiam) (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)); *United States v. Miller*, 116 F.3d 641, 679 (2d Cir. 1997).   "This preference is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme."   *See Salameh*, 152 F.3d at 115; *see also United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991); *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988).   As the Supreme Court has explained:

> Many joint trials—for example, those involving large conspiracies to import and distribute illegal drugs—involve a dozen or more co-defendants. . . . It would impair both the efficiency and the fairness

- 20 -

> of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand.   Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit.   Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson v. Marsh*, 481 U.S. 200, 209-10 (1987); *see also United States v. Zafiro*, 945 F.2d 881, 886 (7th Cir. 1991) (noting that joint trials reduce not only litigation costs but also "error costs," *i.e.*, the costs associated from depriving the jury of making its determinations based on "the full picture"), *aff'd*, 506 U.S. 534 (1993).

Simply put, there is a strong and well-settled presumption that defendants who are indicted together will be tried together.   *See*, *e.g.*, *Zafiro*, 506 U.S. at 537; *United States v. Blount*, 291 F.3d 201, 209 (2d Cir. 2002); *United States v. Diaz*, 176 F.3d 52, 102 (2d Cir. 1999).   Given this presumption, the "prejudice" standard is difficult to satisfy.   That is, a defendant is "not entitled to severance [under Rule 14] merely because [he] may have a better chance of acquittal in [a] separate trial[]."   *Zafiro*, 506 U.S. at 540.   Nor is a defendant entitled to severance simply because the evidence against his co-defendants is more damaging or voluminous than the evidence against him.   *See*, *e.g.*, *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003).   Indeed, "joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible."   *United States v. Locascio*, 6 F.3d 924, 947 (2d Cir. 1993).   And even if a particular defendant is somehow prejudiced by joinder, that prejudice must be "sufficiently severe [as] to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials."   *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986) (quoting

- 21 -

*United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984)).   Thus, under the Supreme Court's decision in *Zafiro*, a discretionary severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."   506 U.S. at 539.

In conspiracy cases, the Court's evaluation of the potential for substantial prejudice must take into account that once a defendant is a member of a conspiracy, "all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant."   *Salameh*, 152 F.3d at 111.   For this reason, the mere fact that there is more extensive evidence regarding one joined co-conspirator is not, standing alone, sufficient to warrant severance.   "The fact that one of several codefendants is tried for a crime not committed by another codefendant does not, without more, create the sort of miscarriage of justice that would require [severance]."   *United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir. 1996); *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) ("[T]he fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." (quoting *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983))).   Further, even when the "risk of prejudice is high . . . less drastic measures—such as limiting instructions—often suffice as an alternative to granting a Rule 14 severance motion."   *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003); *see also Zafiro*, 506 U.S. at 538-39 ("Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.").

Any potential for prejudice can be diminished where the court instructs the jury to consider separately each individual and each charge.   *Spinelli*, 352 F.3d at 55 (noting that spillover prejudice may be remedied by limiting instructions); *United States v. DeVillio*, 983 F.2d 1185,

1192-93 (2d Cir. 1993) (finding that the admission of evidence relating to attempted murder was not sufficient to warrant severance where a limiting instruction was given as to its admissibility only against certain defendants); *Cardascia*, 951 F.2d at 483 (finding that severance was not required where defendants were forced to sit through a month of unrelated evidence of a separate conspiracy involving co-defendants); *United States v. Rosa*, 11 F.3d 315, 341-42 (2d Cir. 1993) (affirming denial of severance motion of two non-violent defendants, reasoning that each was an integral part of the conspiracy and evidence of the violent nature of the conspiracy would therefore have been admissible at the individual trials of the non-violent defendants had they been tried separately); *United States v. Diaz*, 176 F.3d 52, 102-03 (2d Cir. 1999) (finding that the admission of evidence of eight murders in which the moving defendant did not participate did not cause him substantial spillover prejudice).

Finally, because of the preference for joint trials of defendants indicted together, and the discretion afforded to district courts in addressing any potential prejudice, a defendant seeking review of denial of severance under Rule 14 bears an "extremely difficult burden," *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989), of showing that he was so prejudiced by the joinder that he suffered a "miscarriage of justice" or was denied a constitutionally fair trial.   *See United States v. Yousef*, 327 F.3d 56, 150 (2d Cir. 2003); *Rosa*, 11 F.3d at 341.   Consequently, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial."   *Rosa*, 11 F.3d at 341.

### B.  Discussion

Kakkera and Saeedi are properly joined parties under Rule 8(b).   Kakkera and Saeedi are both charged in Count Fourteen as co-conspirators in the very same conspiracy to obstruct the grand jury investigation into their insider trading, which plainly makes joinder proper under Rule

8(b).   Nor does it matter that Saeedi is charged in some counts in which Kakkera is not charged, as Rule 8(b) is explicit that "[a]ll defendants need not be charged in each count."   Moreover, even as to those counts against Saeedi in which Kakkera is not named, those counts involve the "same series of acts or transactions" under Rule 8(b).   Bhardwaj provided both defendants with the material nonpublic information that Lumentum was negotiating an acquisition of Neophotonics; both defendants then traded on that MNPI; and both men then worked together to conspire to obstruct the investigation into that insider trading.

The analysis is not changed by the fact that, just a few months before the Neophotonics acquisition, Bhardwaj also tipped Saeedi about Lumentum's anticipated acquisition of Coherent. The Coherent insider trading charges are clearly properly joined with respect to the other charges involving Saeedi pursuant to Rule 8(a), as they are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan" as his insider trading in Neophotonics and his conspiracy to obstruct justice.   Kakkera does not appear to claim otherwise.   Moreover, although Kakkera did not trade in Coherent, the Indictment does allege his involvement in that activity, as it alleges that Patel, at Bhardwaj's direction, paid to Kakkera $100,000 of Patel's proceeds from illegal trading in Coherent.   Indeed, this $100,000 payment, and the multiple fake promissory notes that were created to cover it up, are part of the obstruction count with which Kakkera is charged.

Nor is severance justified under Rule 14(a).   Kakkera cites the risk of "irremediable, prejudicial spillover" to him from the evidence against Saeedi.   Def. Mot. for Severance at 1. But, there will be no prejudicial spillover from trying Kakkera and Saeedi together, because the proof of the Lumentum insider trading conspiracy involving Bhardwaj and Saeedi is necessary background to the obstruction count in which Kakkera is charged and would admissible direct

proof at Kakkera's trial whether or not Saeedi and Kakkera were joined for trial.   *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (claim of prejudice is insupportable where supposedly prejudicial evidence would be admissible at separate trial); *see also United States v. Blaszczak*, 947 F.3d 19, 44 (2d Cir. 2019) (joinder of insider trading charges was proper and, in any event, harmless, where evidence about separate insider trading scheme would have been admissible in separate trial as relevant and "useful background" on the defendant's methods and sources), *vacated on other grounds by* 141 S. Ct. 1040 (Jan. 11, 2021).   Moreover, any potential prejudice could be cured by means less drastic than severance, such as appropriate limiting instructions. *See Zafiro*, 506 U.S. at 537-39 (explaining preference for joint trials to promote efficiency and that limiting instructions can often cure any prejudice); *United States v. Rivera*, 546 F.3d 245, 254 (2d Cir. 2008) (similar).

Judicial efficiency also militates strongly against severance here.   The same witnesses and documents from Lumentum will be necessary to show the source of the MNPI with respect to each defendant.   The same cooperating witnesses are expected to testify against the same events regarding the same defendants.   Bhardwaj's trading records and documents will be relevant for both defendants.   Saeedi's trading records will be relevant against Kakkera to show when Bhardwaj began providing MNPI in Neophotonics, and vice versa.   Evidence about the Coherent insider trading will be relevant in trials against both Saeedi and Kakkera, because it is probative of the relationship between Bhardwaj and Kakkera, it shows Bhardwaj's modus operandi, and it is necessary information for understanding the obstruction conspiracy.   Severance would thus result in holding the same trial twice.

## IV.    The Court Should Deny the Motion to Suppress Historical Cell-Site Evidence

On April 21, 2022, Magistrate Judge Stewart D. Aaron issued a warrant for historical cell-

site data for five phones, including Kakkera's.   The warrant was supported by a 10-page affidavit

from FBI Special Agent Kristin Allain, which in turn attached and incorporated by reference an

earlier, 23-page affidavit concerning the same phone numbers.   The defendant claims that the

affidavits "did not mention Mr. Kakkera in any material way," Mot. at 7, but that is simply not

true, as even a cursory reading shows.   The affidavits established probable cause that Kakkera

was a participant in the insider trading scheme and that historical cell-site data would lead to

evidence of multiple offenses, including securities fraud and conspiracy to commit securities fraud.

Nor was Judge Aaron's warrant overbroad—it was narrowly tailored to capture the relevant time

periods in which the conspiracy was engaged in illegal behavior.   Moreover, even if the Court

were to determine that probable cause was lacking, or that the warrant was somehow overbroad—

and neither finding is justified here—the agents were certainly acting in good faith in relying upon

Judge Aaron's warrant.   The motion to suppress the historical cell-site evidence should be denied.

### A.  Applicable Law

In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply

to make a practical, common-sense decision whether, given all the circumstances set forth in the

affidavit . . . , there is a *fair probability* that contraband or evidence of a crime will be found in a

particular place."   *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (emphasis added).   Such

determinations must be approached in a practical way, *id.* at 231-32, because "probable cause is a

flexible, common-sense standard," *Texas v. Brown*, 460 U.S. 730, 742 (1983).   The training and

experience of agents may bear significantly on probable cause determinations.   *See Gates*, 462

U.S. at 232.   Inferences drawn by law enforcement based on facts known to them, the totality of

the circumstances, and their training and experience may all support a probable cause finding.   *Id.*

at 231-32; *see also United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004) ("[C]ourts recognize

that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not.") (collecting cases).

Once a search warrant has issued, the issuing judge's "determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (quotation marks omitted). "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review," *id.*, and reviewing courts should "accord substantial deference to the finding of an issuing judicial officer that probable cause exists," *United States v. Boles*, 914 F.3d 95, 102 (2d Cir.), *cert. denied*, 139 S. Ct. 2659 (2019) (quotation marks omitted). Thus, "'[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)); *see also United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998) ("We accord great deference to a judge's determination that probable cause exists, and we resolve any doubt about the existence of probable cause in favor of upholding the warrant." (quotation marks omitted)).

Even when a reviewing court identifies a defect in a warrant, the evidence revealed by the search may be admitted under certain circumstances, including the good faith exception. As the Supreme Court has explained, the exclusionary rule is a "judicially created remedy" that is "designed to deter police misconduct rather than to punish the errors of judges and magistrates." *United States v. Leon*, 468 U.S. 897, 906, 916 (1984). "As with any remedial device, application of the exclusionary rule properly has been restricted to those situations in which its remedial purpose is effectively advanced." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). The rule therefore does not apply "where [an] officer's conduct is objectively reasonable" because suppression

"cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity."   *Leon*, 468 U.S. at 919; *see also United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (the exclusionary rule "does not apply to evidence seized 'in objectively reasonable reliance on' a warrant issued by a detached and neutral magistrate judge, even where the warrant is subsequently deemed invalid." (quoting *Leon*, 468 U.S. at 922)).   Indeed, the Supreme Court has made clear that exclusion of evidence is a "last resort, not [a] first impulse," and "the exclusionary rule is not an individual right and applies only where it results in appreciable deterrence."   *Herring v. United States*, 555 U.S. 135, 140-41 (2009) (quotation marks and citations omitted).

Accordingly, under the good faith exception, evidence collected pursuant to a search warrant later found invalid will be suppressed only if (i) the issuing judge was knowingly misled; (ii) the issuing judge wholly abandoned his or her judicial role; (iii) the application was so lacking in indicia of probable cause as to render reliance upon it unreasonable; or (iv) the warrant is so facially deficient that reliance upon it is unreasonable.   *Falso*, 544 F.3d at 125.   The central question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."   *Leon*, 468 U.S. at 922 n.23.   If the reviewing court finds that the officer's reliance on the warrant was objectively reasonable, suppression is not warranted.   *See id.* at 922; *Davis v. United States*, 564 U.S. 229, 238-39 (2011) ("*Leon* itself, for example, held that the exclusionary rule does not apply when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid.").   Ultimately, to trigger the exclusionary rule, law enforcement "conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."   *Herring*, 555 U.S. at 144.   Put another way, the Supreme Court has "refuse[d] to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the

warrant he possesses authorizes him to conduct the search he has requested." *Massachusetts v. Sheppard*, 468 U.S. 981, 989-90 (1984).

Finally, with respect to standing, a defendant seeking to suppress evidence based on an alleged Fourth Amendment violation must demonstrate that he did in fact have a reasonable expectation of privacy in the location or items searched. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *United States v. Padilla*, 508 U.S. 77, 81 (1993) (per curiam). In order to meet this standard, the defendant generally must establish, at the outset, that he had a "property or possessory interest in the place searched or the items seized." *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir.1991) (citations omitted); *see also, e.g.*, *United States v. Serrano*, No. 13 Cr. 58 (KBF), 2014 WL 2696569, at *4 (S.D.N.Y. June 10, 2014); *Guzman v. Sabourin*, 124 F. Supp. 2d 828, 834 (S.D.N.Y. 2000); *United States v. Ruggiero*, 824 F. Supp. 379, 391 (S.D.N.Y. 1993). The burden is on the defendant to prove the facts necessary to establish that his personal Fourth Amendment rights were violated. *See United States v. Paulino*, 850 F.2d 93, 96 (2d Cir. 1988). That burden "is met only by sworn evidence, in the form of an affidavit or testimony, from the defendant or someone with personal knowledge"; an attorney declaration is insufficient. *United States v. Montoya-Eschevarria*, 892 F. Supp. 104, 106 (S.D.N.Y.1995) (citations omitted); *see also, e.g., Serrano*, 2014 WL 2696569, at *4 (citing *Ruggiero*, 824 F. Supp. at 391).

## B.  Discussion

As an initial matter, Kakkera lacks standing to challenge most of the cell-site data seized pursuant to Judge Aaron's warrant. Kakkera's motion seeks an "Order suppressing *all* historical cell site location information seized pursuant to a Warrant and Order issued on April 21, 2022," Mot. at 1, but that warrant authorized the seizure of data from five phones, only one of which was alleged to be used by Kakkera. Whatever privacy interest he might have in the historical cell-site

data for his own phone, he has no conceivable privacy interest in the cell-site data from other individuals' phones.  *See United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, at *9 (S.D.N.Y. Oct. 9, 2020) ("Regardless of the existence of probable cause for the seizure of the historical location data, Blakstad has failed to present any affidavit suggesting he had an expectation of privacy in the historical location information, compelling his motion's denial."). His motion must be denied to the extent he seeks suppression of cell-site information for phones that he was not even using.

With respect to Kakkera's own phone, the affidavit in support of the warrant supports Judge Aaron's April 21, 2022 finding of probable cause.   The April 21, 2022 affidavit included not only a detailed fact section establishing probable cause, but also attached and incorporated by reference a prior affidavit dated March 24, 2022 in support of a warrant for prospective cell-site information. The defendant has included both affidavits, but has separated them into two exhibits—Exhibits A and B, respectively.  But they were in fact provided to Magistrate Judge Aaron in a single document; they collectively establish probable cause for historical cell-site information from Kakkera's cell phone; and they should be considered in their entirety when the Court evaluates the reasonableness of Judge Aaron's decision.

The combined affidavits allege established that Bhardwaj had access to material nonpublic information about multiple Lumentum acquisitions; that he and multiple individuals with whom he was in phone contact traded on the acquisition targets in advance of the merger announcements; that with respect to the acquisition of Neophotonics, Bhardwaj was specifically in touch with Kakkera in advance of the merger, talking multiple times over phone; that Kakkera and Kakkera's family trust then purchased massive amounts of Neophotonics stock and options right before the merger; and that another member of the conspiracy actually admitted to the Government that

Bhardwaj had met with him in person and provided him with inside information about the Neophotonics acquisition at about the same time as Kakkera's trading. Specifically, the allegations included the following:

- Since in or about 2021, the FBI has been conducting an investigation concerning possible insider trading in the securities of Coherent and Neophotonics by various individuals, including the Target Subjects, which term is defined to include Kakkera (Apr. 22 Affidavit ¶ 7);

- Bhardwaj had access to material nonpublic information about Lumentum's January 2021 acquisition of Coherent and its November 2021 acquisition of Neophotonics, traded on that information himself, and tipped others with that information (March 24 Affidavit ¶¶ 11-13);

- With respect to Neophotonics specifically, Bhardwaj had advance knowledge of Lumentum's planned acquisition of Neophotonics prior to the November 4, 2021 acquisition announcement, and various individuals Bhardwaj had telephone contact with traded in Neophotonics (March 24 Affidavit ¶ 13);

- According to a debriefing of Ramesh Chitor, on or about October 21, 2021, Bhardwaj told Chitor, in person, that Bhardwaj knew that Lumentum was going to be acquiring Neophotonics and that this could mean "big money." Bhardwaj proposed to Chitor that he and Chitor would split in half any earnings that Chitor made from his trading in Neophotonics. Then, on November 2, 2021, Bhardwaj visited Chitor's home and told Chitor that the acquisition was imminent (April 22 Affidavit ¶ 10);

- Between on or about October 15, 2021 and November 2, 2021, Kakkera purchased at least approximately 82,150 shares of Neophotonics stock, which he began selling on or about November 4, 2021, after the announcement of the merger (March 24 Affidavit ¶ 13(c)(iv));

- Between on or about October 15, 2021 and November 1, 2021, Kakkera purchased options contracts in Neophotonics stock, which he began selling and/or exercising on or about November 9, 2021, continuing through February 18, 2022 (March 24 Affidavit ¶ 13(c)(v));

- Between on or about October 19, 2021 and November 3, 2021, the Kakkera Family Trust purchased approximately 47,200 shares of Neophotonics (March 24 Affidavit ¶ 13(c)(vii);

- The SEC estimates that Bhardwaj, Kakkera, and other associates of those individuals made at least approximately $3 million in profits from the Neophotonics acquisition (March 24 Affidavit ¶ 14);

- Bhardwaj and Kakkera were in telephone contact on numerous occasions between March 2021 and October 2021, including calls on or about October 9 and October 10, 2021, shortly before Kakkera began purchasing Neophotonics securities.  Pen register data also showed that Bhardwaj and Kakkera were in frequent contact via WhatsApp between at least January 12, 2022 and March 21, 2022 (March 24 Affidavit ¶ 15(d);

- According to Chitor, After the FBI approached Bhardwaj, Bhardwaj visited Chitor in person, discussed Chtior's profits from the insider trading, and discussed not saying anything to anyone (April 22 Affidavit ¶ 10).

The combined affidavits also provided detailed trading records about other conspirators, phone records showing frequent communications between various co-conspirators, and additional information about Bhardwaj's suspicious activities after the FBI approached him.  Collectively, these allegations provided more than enough information to support Judge Aaron's probable cause determination.

Kakkera also contends that, even if the affidavit established probable cause of insider trading, it did not provide "any basis for believing that Mr. Kakkera's physical location would be relevant evidence of the subject offenses or that Mr. Kakkera ever was in physical proximity to any of the other relevant subjects." Mot. at 7.  But the law is clear that that showing a nexus between a crime and a place to be searched "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (quotation marks omitted).  In determining whether such a nexus is established, a magistrate must "assess[] probabilities" and "look to the factual and practical considerations of everyday life on which reasonable prudent men, not legal technicians, act." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quotation marks omitted). It was reasonable to conclude that Bhardwaj and Kakkera's insider trading conspiracy would include in-person meetings, especially when another of Bhardwaj's tippees—Chitor—received inside information from Bhardwaj in person.

- 32 -

Nor is the warrant overbroad in its date range. The warrant provided the seizure of cell-site information for two separate and relatively short periods: September 1, 2020 to February 28, 2021 and August 1, 2021 to December 31, 2021. These dates correspond to the relevant times Bhardwaj was providing insider information to his associates. The affidavit alleges that Lumentum was considering an acquisition of Neophotonics between September 2020 and January 2021, and that Bhardwaj traded in Neophotonics stock around that time period, March 22 Affidavit ¶ 13(a) n.14; that Lumentum then began merger discussions with Coherent as early as November 2020, *id.* ¶ 10(c), that Bhardwaj began trading in Coherent on November 23, 2020, *id.* ¶ 11(c)(i), that the acquisition was announced on January 19, 2021, *id.* ¶ 10(d); that Bhardwaj's associates purchased Coherent securities around the same time that he did, *id.* ¶ 11(d)-(g); and that Bhardwaj and some of his associates continued selling Coherent securities through February 2021, *id.* ¶ 11(c)-(g). Then, in October 2021, Lumentum resumed merger negotiations with Neophotonics, during which period Bhardwaj, Kakkera, and others began trading in Neophotonics securities while in phone communication with one another, *id.* ¶ 13; Kakkera sold his Neophotonics securities beginning after the November 4, 2021 acquisition announcement and through February 2022, *id.* ¶ 13(c)(v); and Kakkera and Bhardwaj were in phone contact between at least October 2021 and March 2022, *id.* ¶ 13(c)(vi). These facts support the relevant timeframes authorized by the warrant. And even if there were not precise allegations of fact surrounding each and every portion of the date range—and, here, there is—courts have repeatedly held that it is reasonable to expand a search to a period before and after known events. *See, e.g.*, *Blakstad*, 2020 WL 5992347, at *9 (search of 15 months' emails before first known criminal transaction was reasonable search for "evidence of a prior relationship among co-conspirators," and data after all unlawful transactions "may show evidence of how the proceeds from the transactions were

distributed and to whom" (citations omitted).[6]   Investigations of broad, long-term, and/or complex criminal activity can support warrants for broad categories of information and evidence, including, often without any date limitations at all.   *See, e.g.*, *United States v. Jacobson*, 4 F. Supp. 3d 515, 522 (E.D.N.Y. 2014) (broad warrant justified because "the crimes under investigation were complex and concerned a long period of time, not simply one or two dates of criminal activity"); *United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712, at *8 (S.D.N.Y. Feb. 25, 2013) (broad warrant with no time limitation justified by breadth and complexity of fraud); *United States v. Dupree*, 781 F. Supp. 2d 116, 149 (E.D.N.Y. 2011) ("The nature of the crime . . . may require a broad search . . . ."); *United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at *9 (S.D.N.Y. Jan. 6, 2010) ("[A] time frame is less relevant to a warrant's breadth where the criminal acts are complex and necessarily extend over a significant period of time.").   At a minimum, it was entirely reasonable for agents to rely on the judicial authorization to collect the location data at issue, given the probable cause offered.

Finally, even if the warrant were somehow found to be deficient, the agents were clearly acting in good faith in relying upon it, and the fruits of the search should not be suppressed. Kakkera contends that the good-faith exception should not apply because "the Affidavits are so utterly and facially deficient in probable cause."   Mot. at 13.   As set forth above, the affidavits contained extensive allegations establishing probable cause.   But even if this Court were to reach a contrary decision, and find that Judge Aaron made a mistake and the affidavits did not in fact

---

[6] Location information for a period of time before and after a specific incident may also be needed to investigate whether the co-conspirators being located together was unusual (supporting the inference that they were meeting for illegal purposes) or commonplace (suggesting they were together for a routine, innocent reason).   Either way, the defendant's pattern of activity in the months surrounding a specific incident is plainly evidence that agents must investigate in order to draw appropriate inferences from location data at the time of the suspected tip.

establish probable cause, the affidavits certainly set forth enough allegations for the agents to have reasonably believed that Judge Aaron's conclusion was correct, and that the search was legal.

**V.      The Court Should Deny the Motion to Compel**

The SEC is a separate and independent agency that engaged in a parallel investigation into Bhardwaj's insider trading ring.   As discussed below, the SEC is not a part of the prosecution team.   In urging the Court to find otherwise, Kakkera relies on the fact that the Government and the SEC conducted joint interviews, that the SEC provided information to the Government, and that the Government and the SEC announced their respective charges on the same day—all routine occurrences in parallel investigations conducted by different government agencies.   Indeed, contrary to Kakkera's argument, the fact that the Government and the SEC conducted joint witness interviews resulting in only one set of interview notes taken and maintained as part of the criminal investigation file makes it less likely, not more, that material arguably favorable to Kakkera's defense would be found in the SEC's file.   In any event, the law is clear that because the SEC is not part of the prosecution team, Kakkera's motion to require the Government to search the files of separate and independent actors should be denied.   Kakkera's requests are contrary to the law and would improperly extend the law of this Circuit in ways that would result in perverse and undesirable incentives and undermine the efficient enforcement of the criminal and civil laws.

**A.  Applicable Law**

"Under *Brady* and its progeny, the government has an affirmative duty to disclose favorable evidence known to it." *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). This duty extends to the prosecution team.   In other words, a prosecutor "is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.'" *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)); *accord United States v. Hunter*, 32 F.4th 22, 36 (2d Cir. 2022).

The Government's duty to obtain and produce Rule 16 and *Brady* material is also limited to material in the possession of the prosecution team.   *Hunter*, 32 F.4th at 36 ("We have long rejected the notion that 'knowledge of any part of the government is equivalent to knowledge on the part of th[e] prosecutor.'" (quoting *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971))); *Avellino*, 136 F.3d. at 255 ("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis."); *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550, at *22 (S.D.N.Y. July 24, 2014), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016) (*Brady* is "not a discovery doctrine that c[an] be used to compel the Government to gather information for the defense.").

Although "[t]he Second Circuit has not yet articulated a test to decide when knowledge of *Brady* material may be imputed from one agency to another," *United States v. Velissaris*, No. 22 Cr. 105 (DLC), 2022 WL 2392360, at *2 (S.D.N.Y. July 3, 2022), the Circuit has provided guidance, and courts within this District have articulated a number of factors for determining the

scope of the prosecution team and whether a joint investigation occurred.   The Circuit counsels that "the relevant inquiry [for determining whether a person is a member of the prosecution team] is what the person did, not who the person is."   *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006).   "Individuals who perform investigative duties or make strategic decisions about the prosecution of the case are considered members of the prosecution team, as are police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (summary order).   "At bottom," the determination of who constitutes the prosecution team, "involves a question of agency law: should a prosecutor be held responsible for someone else's actions?   *United States v. Meregildo*, 920 F. Supp. 2d 434, 443-44 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015).   "Generally, a principal is responsible for the knowledge of an agent when that agent has a duty to give the principal information or when the agent acts on his knowledge regarding a matter that is within his power to bind the principal.   An agent's duty to disclose is thus linked to his power to bind the principal."   *Id.*   In the context of a criminal investigation and prosecution, the individuals empowered to bind the prosecutor consist generally of those who "actively investigate[] the case, act[] under the direction of the prosecutor, or aid[] the prosecution in crafting trial strategy."   *Meregildo*, 920 F. Supp. 2d at 442; *see also United States v. Barcelo*, No. 13 Cr. 38 (RJS), 2014 WL 4058066, at *9 (S.D.N.Y. Aug. 15, 2014) ("To determine whether someone is a member of the prosecution team—in other words, whether the prosecution can be deemed to have constructive knowledge of information held by that individual—the Court considers the totality of the circumstances, including whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy."), *aff'd*, 628 F. App'x 36 (2d Cir. 2015).

Applying these principles, the Second Circuit and courts in this District, including this Cout, have consistently rejected efforts to impose discovery obligations on the Government related to information held by entities that do not act as agents of the prosecution, including cooperating witnesses, expert witnesses for the Government, other government agencies, and even separate components of the Justice Department.   *See Chow*, No. 17 Cr. 667 (GHW) 2/9/2018 Tr. (Dkt. 69) at 87 (denying a similar motion to compel and noting that interactions between the Government and the SEC were "structured in a way to avoid the Court concluding that they had conduct a joint investigation"); *see also, e.g.*, *Barcelo*, 628 F. App'x at 38 (holding that a cooperating witness was not a part of the prosecution team where he "played no role in the investigation or in determining investigation or trial strategy," and "did no more than provide information to the government and testify at trial"); *Stewart*, 433 F.3d at 299 (holding that a civilian employee of the Secret Service who testified as an expert witness for the Government was not a member of the "prosecution team" for *Giglio* purposes); *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) (holding that for *Giglio* and Jencks Act purposes, the Government had no discovery obligation related to information filed in an unrelated bankruptcy proceeding); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (holding that the reports made by FBI agents in the course of investigations unrelated to the defendants' prosecutions were not possessed by the prosecution team); *Pina v. Henderson*, 752 F.2d 47, 49 (2d Cir. 1985) (holding that a prosecutor's constructive knowledge did not extend to a parole officer who "did not work in conjunction with either the police or the prosecutor"); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting "completely untenable position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor'"); *United States v. Morgan*, 302 F.R.D. 300, 304 (S.D.N.Y. 2014) ("[T]he prosecution team does not include federal agents, prosecutors, or parole officers who are

- 38 -

not involved in the investigation."); *Meregildo*, 920 F. Supp. 2d at 444 ("[I]n most cases, cooperating witnesses should not be considered part of the prosecution team.").

Courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession, custody or control of another agency for *Brady* evidence only where the Government conducts a "joint investigation" with another state or federal agency. *United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) (affirming district court opinion holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC); *SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (finding that facts similar to those here "make clear that the investigations, while they may have overlapped, were not conducted jointly" in denying the defendant's request for the Court to require the SEC to access and review FBI interview notes that were not in the SEC's possession, custody or control); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (holding that the Government and the NYSE, even if it were a state actor, did not conduct a joint investigation related to the policies of the NYSE); *Ferreira v. United States*, 350 F. Supp. 2d 550, 556-57 (S.D.N.Y. 2004) (holding that cooperation between the Government and NYPD was "not sufficient to make the Government and the state prosecutor members of the same prosecutorial team"); *United States v. Upton*, 856 F. Supp. 727, 749-50 (E.D.N.Y. 1994) (holding that the Government and FAA did not conduct a "joint investigation" even though the FAA provided two inspectors to assist the criminal investigation); *United States v. Guerrerio*, 670 F. Supp. 1215, 1219 (S.D.N.Y. 1987) (denying Rule 16 discovery request for grand jury minutes at the Bronx District Attorney's Office where there was no joint investigation with the Government and the Government had no control over the material).

To determine whether the criminal prosecution conducted a "joint investigation" with

another agency, such that the other agency should be considered part of the prosecution team, courts consider a number of factors, including whether the other agency "(1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (citing *United States v. Blaszczak*, 308 F.Supp.3d 736, 741-42 (S.D.N.Y. 2018)); *see also United States v. Collins*, 409 F. Supp. 3d 228, 241 (S.D.N.Y. 2019) (finding no joint investigation where SEC and Government participated in some joint interviews); *United States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, at 87 (S.D.N.Y. Feb. 9, 2018) (finding no joint investigation where agencies shared information but made their own determinations regarding what documents to obtain and what facts to ask a witness); *accord Stanard*, 2007 WL 1834709, at *3  (FBI and SEC did not conduct a joint investigation despite participating in joint interviews during which only FBI took notes); *United States v. Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008) (finding that parallel civil and criminal investigations were not "joint").

### B. Discussion

#### 1. The Government Did Not Conduct a Joint Investigation

The SEC is not part of the Government's prosecution team.  As described in the AUSA Affirmation attached as Exhibit B to this brief, although the Government and the SEC conducted joint interviews for the convenience of witnesses, most aspects of the Government's investigation were conducted without any involvement of the SEC:

- the Government and the SEC each initiated their separate investigations

independently;

- the SEC played no role in the Government's charging decisions or the development of the Government's prosecutorial strategy;

- likewise, the Government played no role in the SEC's charging decisions or the development of the SEC's litigation strategy;

- no one from the SEC was designated a special Assistant U.S. Attorney to work on the criminal investigation;

- at jointly conducted interviews, witnesses were told that the agencies' investigations were separate, that the interviews were conducted together only as a matter convenience, and that, if there were to be a proffer agreement, the witness would enter into a separate agreement with each agency;

- the SEC was not involved in presenting this case to the grand jury and did not receive grand jury transcripts;

- the SEC did not participate in the execution of search warrants or the responsiveness reviews of materials obtained pursuant to search warrants;

- the SEC did not obtain materials produced to the Government pursuant to grand jury subpoenas;

- the SEC has not accompanied the Government to Court.

*See Collins*, 409 F. Supp. 3d at 242 (citing many of these factors in support of a finding that the SEC and the Government did not conduct a joint investigation); *United States v. Alexandre*, No. 22 Cr. 326 (JPC), 2023 WL 416405, at *6-8 (S.D.N.Y. Jan. 26, 2023) (same).  These factors, considered together, weigh heavily in support of a finding that the Government and the SEC engaged in separate investigations, notwithstanding their focus on overlapping subject material.

Notwithstanding that the SEC is not part of the prosecution team, the Government has agreed to voluntarily request that the SEC produce to the Government all records it obtained from third parties in its parallel investigation, which, to the extent it has not already done so, the Government will produce to the defendant.   Indeed, Government has already produced to defense counsel all documents fitting this description that it has already received from the SEC.   In the event the SEC produces to the Government additional documents that the SEC received from third parties, the Government will promptly produce those documents to defense counsel.

### 2. Kakkera Fails to Cite Facts Showing a Joint Investigation

None of the facts cited by Kakkera establish the existence of a joint investigation in this case.   Rather, Kakkera repeatedly seeks to paint as unusual or suspect facts that are routine in the parallel investigation context, such as the Government and the SEC bringing charges on the same date (Mot. at 13-14), s*ee SEC v. Shkreli*, No. 15 Civ. 7175 (KAM), 2016 WL 1122029, at *7 n.6 (E.D.N.Y. Mar. 22, 2016) ("The court finds no fault in the SEC's commencement of the civil action at or around the time the criminal indictment was unsealed, given the SEC's independent mandate to enforce the securities laws and the need to commence an action before expiration of the statute of limitations."), and the fact that witness interviews were conducted jointly (Mot. at 11-12), *see, e.g.*, *Collins*, 409 F. Supp. 3d at 242 (finding no joint investigation when the Government and the SEC participated jointly in some interviews "and the SEC did not take notes during the interviews and does not have any notes from the interviews"); *Blaszczak*, 308 F. Supp. 3d at 738 (finding no joint investigation despite the Government and the SEC conducting thirty-nine joint witness interviews).   Indeed, both of these circumstances are natural where two agencies pursuing separate investigations would endeavor not to let their respective investigations interfere with each other.

Kakkera also points to the fact that the Government obtained documents and information

from the SEC (Mot. at 12), but that is entirely normal and appropriate.   The Government routinely

obtains documents and information from any number of individuals and entities in its

investigations, and the Government is aware of no authority for the proposition that that bare fact

transforms those sources of information into members of the prosecution team.   To the contrary,

courts have specifically rejected that proposition.   *See, e.g.*, *Meregildo*, 920 F. Supp. 2d at 445-

46 (holding that cooperating witness was not a member of the prosecution team); *United States v.*

*Barcelo*, 628 F. App'x 36, 38–39 (2d Cir. 2015) (same); *Stewart*, 433 F.3d at 298–99 (holding that

an expert witness who analyzed evidence, assisted the prosecution in preparing cross-examination

questions, participated in a mock examination, and testified at trial was not a member of the

prosecution team).   Indeed, it would be highly unusual if the SEC refused to provide information

to the Government in connection with an ongoing criminal inquiry into a massive fraud, such as

the one perpetrated by Kakkera.   "Moreover, 'there is no general rule" prohibiting a civil

enforcement agency such as the SEC from "sharing . . .   evidence acquired through civil

discovery with criminal prosecutors.'"   *United States v. Rhodes*, No. 18 Cr. 887 (JMF), 2019 WL

3162221, at *3 (S.D.N.Y. July 16, 2019) (quoting *United States v. Fiore*, 381 F.3d 89, 94 (2d Cir.

2004)).   "Indeed, because '[s]ecurities fraud is a proper subject of both administrative and

criminal investigations . . . SEC enforcement officials and prosecutors all expect coordination at

some investigative level and perceive the various proceedings as integral to each other." *Rhodes*,

2019 WL 3162221, at *3 (quoting *Fiore*, 381 F.3d at 94).   Kakkera fails to cite any authority for

the proposition that an independent agency becomes part of the prosecution team simply by

complying with a voluntary information request.

Likewise, the fact that the Government and the SEC—both tasked with enforcing anti-

fraud laws and protecting victims, and both investigating the same conduct perpetrated by the same individual against the same victims—may have shared certain evidence and informed each other of anticipated investigative or enforcement steps is wholly unremarkable and routine.   Such "coordination and sharing between the lawyers and agents on the criminal prosecution team, on the one hand, and [a civil enforcement authority], on the other, is, in itself, unexceptional and unproblematic."   *Rhodes*, 2019 WL 3162221, at *3

The typical overlap between investigations that existed here to promote efficiency and reduce costs has been deemed by many judges in this District as indicative of parallel, not joint, investigations.   In *Stanard*, for example, then-District Judge Lynch addressed a defendant's discovery request to the SEC to obtain and produce notes and memoranda that were in the possession, custody and control of the U.S. Attorney's Office but which the SEC had reviewed. *Stanard*, 2007 WL 1834709, *2.   Acknowledging that the SEC could be considered to have "effective control" over the documents if it conducted a joint investigation with the Government, Judge Lynch instead determined that the facts of the case "ma[d]e clear that the investigations, while they may have overlapped, were not conducted jointly," and rejected the defendant's argument.   *Id.*; *see also United States v. Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010) (Dkt. No. 90); *Rigas*, 2008 WL 144824, at *2; *Stanard*, 2007 WL 1834709, at *3; *Middendorf*, 2018 WL 3956494, at *4-5; *Blaszczak*, 308 F.Supp.3d at 741-42; *Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, at 87.

The simultaneous nature of the Government and SEC's actions is a reflection of the normal and appropriate sharing of information that occurs in separate, parallel criminal and civil investigations.   In part for these reasons, parallel investigations between the SEC and the Government have been endorsed in support of the "[e]ffective enforcement of the securities laws."

- 44 -

*SEC v. Dresser Industries*, *Inc.*, 628 F.2d 1368, 1377 (D.C. Cir. 1980) (en banc) ("If the SEC suspects that a company has violated the securities laws, it must be able to respond quickly: it must be able to obtain relevant information concerning the alleged violation and to seek prompt judicial redress if necessary.   Similarly, Justice must act quickly if it suspects that the laws have been broken. Grand jury investigations take time, as do criminal prosecutions.").

The balance of the *Blaszczak* and *Middendorf* factors also weigh against Kakkera's argument.   The Government did not disclose documents obtained from grand jury subpoenas to the SEC, and the SEC was not involved in the Government's grand jury presentation.   The Government and the SEC each made independent decisions about what charges or claims they intended to bring.   Nor did the Government or the SEC direct one another to take any particular investigative actions.   Instead, each agency took the appropriate respective prosecutorial and regulatory enforcement action it deemed necessary.

In sum, under these facts and circumstances, the SEC was not part of the Government's prosecution team, and the defendant's request to compel Government to obtain and review the SEC's full investigative file is without merit.

## VI.    The Court Should Deny the Defendant's Discovery Motions

The defendant's motion includes an assortment of requests for orders requiring the Government to make various disclosures.   Specifically, the defendant has moved for orders compelling the Government to disclosure *Brady* materials and make early disclosure of Rule 404(b) evidence.   As explained below, each of these motions is either meritless or calls for disclosures to be made exceptionally and excessively far in advance of trial, without justification

With respect to Kakkera's motion to compel the Government to immediately disclose exculpatory information pursuant to *Brady v. Maryland* and its progeny, the Government has fully

complied with its discovery obligations in this case, and will continue to do so.   The Government

recognizes its continuing obligation to disclose *Brady* material, and to make a diligent search for

any relevant material that may be in the possession of the "prosecution team," including

investigating agents and officers.   The Government will provide timely disclosure when and if

any such additional material comes to light.   Courts in this Circuit routinely deny specific requests

for *Brady* material where, as here, the Government has made a good-faith representation to the

Court and defense counsel that it recognizes and has complied with its disclosure obligations under

*Brady*.   *See, e.g.*, *United States v. Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y.

Jan. 11, 1999) (denying defendant's motion to compel production of *Brady* material based on

Government's representations that "it is aware of its obligations under *Brady* . . . and will produce

any *Brady* material to the defense well before trial"); *United States v. Yu*, No. 97 Cr. 102 (SJ),

1998 WL 57079, at *4-5 (E.D.N.Y. Feb. 5, 1998) (denying defense request that Government

provide early disclosure of *Brady* material because Government acknowledged its continuing

obligation to provide exculpatory material upon its discovery and assured that it would comply

with that obligation); *United States v. Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

Kakkera suggests that the Government has in its possession exculpatory information

showing that Bhardwaj did not learn about the Neophotonics merger until after Kakkera began

purchasing Neophotonics shares on October 15, 2021.   Kakkera's speculation is based on the fact

that in November 2021, as part of an investigation conducted by the Financial Industry Regulatory

Authority ("FINRA"), Lumentum provided to FINRA a chronology about the Neophotonics

merger in which it identified October 25, 2021 as the earliest date on which Bhardwaj learned of

the merger.   Mot. at 4.   But Kakkera only knows about this document because the Government

produced it in Rule 16 discovery.   Additional documents produced by Lumentum indicate that

Bhardwaj in fact knew about the Neophotonics merger earlier than the October 25 date provided to FINRA.   Mot. at 5.   From the start, and as the Government has repeatedly informed Kakkera's counsel, the Government produced to Kakkera all the documents that Lumentum has provided to the Government.

On April 10, 2023, Kakkera subpoenaed Lumentum for documents relied on by Lumentum in telling FINRA that Bhardwaj's date of awareness was October 25, 2021.   Mot. at 6-7.   In response, Lumentum produced a spreadsheet that showed Bhardwaj was added to the list of individuals who knew about the Neophotonics merger on October 21, 2021.   Mot. at 7.   Kakkera alleges that "[t]his document, which is clearly exculpatory as to Mr. Kakkera, had never previously been produced by the Government."   Mot. at 7.   But the Government did not previously have this document—Lumentum produced this document to the Government at the same time it produced it to Kakkera.   And the Government in turn immediately produced it to Kakkera as well, out of an abundance of caution.   To the extent Lumentum provided the Government any documents about Bhardwaj's date of awareness of the Neophotonics merger, those documents have been produced—as have all the documents Lumentum produced to the Government.

Finally, the Court should deny Kakkera's request for an order that "uncharged crimes or other bad acts" evidence pursuant to Federal Rule of Evidence 404(b) be disclosed 60 days before trial.   Rule 404(b) "sets no minimum time for action by the government in this request, nor would any time limit be appropriate, since the evidence the government wishes to offer may well change as the proof and possible defenses crystallize."   *United States v. Matos-Peralta*, 691 F. Supp. 780, 791 (S.D.N.Y. 1988); *see United States v. Allums*, 1997 U.S. Dist. LEXIS 14665, at *4 (S.D.N.Y. Sept. 25, 1997) ("The Government has agreed to produce this material in time so that the defense may have an opportunity to challenge their admission; this is all that is required with respect to

Rule 404(b) evidence.").   Indeed, the Second Circuit has approved disclosure of Rule 404(b) evidence as late as several days before and even during trial, depending on the circumstances of the particular case.   *See United States v. Valenti*, 60 F.3d 941, 945 (2d Cir. 1995) (notice four days prior to trial sufficient where Government provided documents to defense on same day they were obtained); *United States v. Matthews*, 20 F.3d 538, 16 551 (2d Cir. 1994) (notice during trial sufficient when balanced against need to avoid indirect disclosure of identity of Government witness).

Consistent with the settled law set forth above, the Government will provide notice of any Rule 404(b) evidence reasonably in advance of trial, affording the defense adequate opportunity to challenge the admission of any such evidence.   The Government recognizes that the parties are likely to agree to a pretrial schedule addressing the timing of Rule 404(b) notice (among other pretrial disclosures).   The Government respectfully submits that there is no reason for the Court to depart from its customary practice of allowing the parties to negotiate a date for Rule 404(b) notice, and that the defendant's motion at this early stage is premature.

Accordingly, no further order is necessary and the motions should be denied.

**CONCLUSION**

For the reasons set forth above, the Government respectfully submits that Kakkera's pretrial motions are wholly without merit and should be denied.

Dated:  New York, New York
         June 12, 2023

                                    Respectfully submitted,

                                    DAMIAN WILLIAMS
                                    United States Attorney

                          By:  _____/s/_____
                                    Adam S. Hobson
                                    Assistant United States Attorney
                                    United States Attorney's Office
                                    One Saint Andrew's Plaza
                                    New York, New York 10007
                                    (212) 637-2484